# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **MARK AND LISA MEHLBERGER** | § | |
| **INDIVIDUALLY AND AS NEXT FRIENDS** | § | |
| **FOR E.M. AND J.M** | § | |
| **Plaintiffs** | § | |
| | § | |
| **v.** | § | **CIVIL CAUSE No. 5:15-CV-00725** |
| | § | |
| | § | |
| **CATHOLIC DIOCESE OF SAN ANTONIO,** | § | |
| **TEXAS, OUR LADY OF PERPETUAL HELP** | § | |
| **CATHOLIC SCHOOL and** | § | |
| **KIRSCH WILBERG, INDIVIDUALLY** | § | |
| **Defendants** | § | |

## ORIGINAL COMPLAINT

**NOW COMES** Mark and Lisa Mehlberger, Individually and also as next friends (a/n/f) for their daughters E.M and J.M., hereinafter collectively referred to as Plaintiffs, complaining of and about the *Catholic Diocese of San Antonio, Texas, Our Lady Of Perpetual Help Catholic School*, (hereinafter referred to as "the Catholic School" or OLPH) and Kirsch Wilberg, Principal of the OLPH (collectively referred to as "the Defendants"), and for cause of action files this their "Original Complaint" and would respectfully  show unto this Court the following:

## I. PROLOGUE AND BRIEF INTRODUCTION TO THE CASE

1. Concern for people with disabilities was one of the prominent themes in Jesus' earthly ministry. When asked by John's disciples, "Are you He who is to come or do we look for another?" Jesus spoke and responded with words recalling the prophecies of Isaiah:

> "Go back and report to John what you hear and see; the blind recover their sight, the lame walk, the lepers are cleansed, the deaf hear, dead men are raised to life, and the poor have the Gospel preached to them." (Matthew 11:3-5).

It is likewise true that this commitment to the needs of the infirm, are even more strongly felt when dealing with the needs of children with disabilities.  Children like E.M. and J.M., have long been a center of religious thought and prayer in the Catholic Church, but as will be more fully described below, not for the *Archdiocese of San Antonio, Texas*, *Our Lady of Perpetual Help Catholic School* and its Principal Kirsch Wilberg.

2.     Due to their mutual failures to follow the precepts of their religious own imperatives, the principles and standards set forth in their own writings on the subject and related federal law the Mehlberger's bring forth federal claims pursuant to the *Americans With Disabilities Act*, 42 U.S.C.A §12101 *et seq* and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794; as well as state law claims pursuant to contract law, the Texas Deceptive Trade Practices-Consumer Protection Act, negligence, negligent misrepresentation and defamation, all as more fully described below.

## II.  <u>JURISDICTION</u>

3.     Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §1331, 1343 and 42 U.S.C. §12188 because the matters in controversy arise under the laws and rules of the United States as noted above.

4.     In addition this Court has supplemental jurisdiction over the state and common law claims pursuant to 28 U.S.C. §1367

## III.  <u>VENUE</u>

5.     Under 28 U.S.C. § 1391, venue is proper before this Court because the events and omissions giving rise to the Plaintiff's claims occurred in the Western District of Texas and in the San Antonio Division.

## IV.  <u>PARTIES AND SERVICE</u>

6.      Plaintiffs Mark and Lisa Mehlberger, are the natural parents of their daughter J.M and E.M.. They bring forth this cause in a representational capacity "as next friends" for their daughters. They reside in at 911 Peg Oak, San Antonio, Texas 78258 of Bexar County, Texas. The last three digits of Mark's social security number is 690.   The last three digits of Mark's driver's license is 724.   The last three digits of Lisa's social security number is 494.  The last three digits of Lisa's driver's license is 824.  He and his wife bring forward this lawsuit individually and also in their representational capacities.

7.      Defendant Catholic Diocese of San Antonio, administers and provides oversight to, and among other things, the Catholic School System of the San Antonio, Texas area. The Archbishop, the Most Reverend Gustavo Garcia-Siller, may be served at 2718 West Woodlawn, San Antonio, Texas, 78828 or likely by and through their counsel, the Honorable Mr. Ronald E. Mendoza, Esq., Davis, Cedillo & Mendoza, Inc., 755 E. Mulberry Avenue, McCombs Plaza Suite 500, San Antonio, Texas 78212-3135; (210) 822-6666 [Telephone]; (210) 822-1151 [Facsimile]; (210) 734-2620 | Fax: (210) 734-0231

8.      Defendant Our Lady Of Perpetual Help Catholic School, is a private school providing such service here in the State of Texas.  They may be served by and through the Principal of the school, Ms. Kirsh Wilberg at their Central Office at 16075 N. Evans Road, Selma, Texas 78154-3824 or by and through their counsel, the Honorable Mr. Ronald E. Mendoza, Esq., Davis, Cedillo & Mendoza, Inc., 755 E. Mulberry Avenue, McCombs Plaza Suite 500, San Antonio, Texas 78212-3135; (210) 822-6666 [Telephone]; (210) 822-1151 [Facsimile].

9.      Defendant Kirsh Wilberg is the Principal of the Elementary and Middle School at the Our Lady Of Perpetual Help Catholic School, private school providing such services here in the State of Texas.   She may be served individually at the School's Central Office and her place of

employment, at 16075 N. Evans Road, Selma, Texas 78154-3824 or by and through their

counsel, the Honorable Mr. Ronald E. Mendoza, Esq., Davis, Cedillo & Mendoza, Inc., 755 E.

Mulberry Avenue, McCombs Plaza Suite 500, San Antonio, Texas 78212-3135; (210) 822-

6666 [Telephone]; (210) 822-1151 [Facsimile].

## V.  **FACTS**

A.      ABOUT CANON LAW AND THE EDUCATION OF CHILDREN WITH DISABILITIES

10.     As noted above, concern for people with disabilities was one of the most prominent early themes

in Jesus' ministry. Further, this concern is given even further import when dealing with children

who have a disability.  On the most basic level, the Catholic Church hopes to respond to persons

with disabilities by defending their rights. Pope John XXIII's encyclical *Pacem in Terris* stresses

the innate dignity of all men and women and states:

"In an ordered and productive community, it is a fundamental principle that every
human being is a `person'. . . . [One] has rights and duties . . . flowing directly and
spontaneously from [one's] very nature. These rights are therefore universal, inviolable
and inalienable."

11.     The *Pastoral Statement of U.S. Catholic Bishops on People with Disabilities* wrote:

"(at 14). In the case of many people with disabilities, integration into the Christian
community may require nothing more than issuing an invitation and pursuing it. For
some others, however, full participation can only come about if the Church exerts itself
to devise innovative programs and techniques. At the very least, we must undertake
forms of evangelization that speak to the particular needs of individuals with
disabilities, make those liturgical adaptations which promote their active participation
and provide helps and services that reflect our loving concern.

(at 15).  This concern should be extended also to the families and especially the parents.
No family is ever really prepared for the birth of a child with a disability. When such
a child does come into the world, families often need strong support from their faith
community. That support must remain firm with the passage of years. The path to
independence can be difficult. Family members need to know that others stand with
them, at least in spirit, as they help their children along this path."

---

[1].    The word *kanon* in Greek means a ruler or a measure. So when we speak of "canon law" we refer to the measure by which our behavior is to build up the unity of the Church. In the Church's history, such measures or standards were usually published after the major councils of the Church. These were compiled at different times in the Church's history, but were finally written into a single code in 1917. When Blessed John XXIII called for an ecumenical council on January 25, 1958, he also called for a revision of the 1917 Code of Canon Law. The revision was done in consultation with all the bishops of the world, along with the bishops' conferences and the schools and professional societies of canon law throughout the world. The result of this was the current Code of Canon Law which went into effect on November 27, 1983. From time to time, this law is supplemented by other legislation issued by the Holy Father, as well as by local legislation by the diocesan bishop or the conference of bishops, as well as local parish policies.

[2].    The Code consists of 1752 canons, divided into seven "books" (General Norms, the People of God, The Teaching Office of the Church, The Sanctifying Office of the Church, Temporal Goods, Sanctions, and Processes). The reason why we have so few laws for the Church (as opposed to, for example, the civil or criminal codes in the United States) is due to the fact that canon law is based upon Roman law, and not English common law. As such, it lays down basic principles that are then applied to individual cases by those who have the responsibility of governing the Church.

14.   These precepts are fully embraced and adopted by the Archdiocese of San Antonio, Texas, at least in writing.  They are further incorporated into the *Our Lady of Perpetual Help Catholic School* Student Parent Handbook and also in contractual agreement with parents, at least in writing.  Unfortunately, they have not been fully put into practice.

B.   THE ARCHDIOCESE OF SAN ANTONIO, TEXAS

15.   The Catholic Archdiocese of San Antonio, Texas administers and provides support to over twenty-three elementary (23) schools in San Antonio, as well as ten (10) high schools.  For all practical purposes it functions just like a School Board for an independent public school district.

16.   At many of these schools the Diocese supports and provides free and reduced costs breakfast programs, that are administered through the United States Department of Agriculture.  In such agreements, there is a requirement that the Diocese assures that it's members follow a number of federal standards, including and especially the duty not to discriminate based upon disability, pursuant to the Americans with Disabilities Act ("ADA") or pursuant to Section 504 of the Rehabilitation Act of 1973.

17.   The Catholic Schools Council of The Archdiocese of San Antonio is a consultative body, appointed by the Archbishop, whose purpose is to advise the superintendent, promote Catholic education, and serve as a liaison for local school councils.  During a significant period of time during this case, Mrs. Marti West was the Superintendent of Catholic Schools.  In addition, the Mehlberger's also worked with Dr. Andrea Gonzalez, PsyD, the Director of Counseling and Student Services for the Catholic School system.

"The fundamental purpose of Catholic Schools in the Archdiocese of San Antonio is to proclaim the Good News of Jesus the Christ. His news is one of challenge, love, and unity. His spirit is caught in the lives of students. Affirming that parents are the primary

educators and partners of education, we prepare students to share the spirit of Jesus through community building, Christian acts of service, and word and worship. We commit to provide inspiring active learning and quality education so that all students share the Spirit of Catholic Education. The Vision Statement calls forth *core beliefs* that affirm the missionary dynamics of all Catholic Schools in the Archdiocese of San Antonio."

18.    The Diocese also provides support so that the Catholic schools offer counseling services that provide, through a "Christ-centered, solution-focused approach," the developmental guidance necessary to help facilitate intellectual, emotional, social and spiritual growth of students, so they can more effectively handle their lives and their interactions with others. Three main areas of focus are counseling, consultation and coordination.  The counseling sessions may address such (disabling) conditions as behavioral, social or emotional functioning, attention/hyperactivity, signs of depressed or anxious mood, as well as coping with changes or challenges at school or in the home.

19.    In regard to students with disabilities the Diocese provides support for students possessing different learning needs through coordination, consultations, direct services, academic support, and professional development.  This includes coordinating testing and evaluation services to identified students with local public school districts; to provide consultation services to schools regarding identification of students in need of testing, interpretation of evaluation results, implementation of evaluation recommendations/accommodations in the classroom, and need for any additional referrals/community services; to ensure appropriate services are being provide and interventions are followed through for student's success; help in the implementation of *accommodations/modifications*, initiating the referral process for appropriate services and providing professional development for staff.

20.     On behalf of its member Catholic Schools the Diocese helps support the larger *Catholic Conference Education Conference* (TCCED).  This organization was developed by a collaborated effort between the Texas Education Agency (TEA), the Texas Association of Non-Public Schools (TANS) and a core group of private school associations.  A single umbrella organization for private school accreditation came into being, called the Texas Private School Accreditation Commission (TEPSAC).  It is now responsible for the implementation of the accreditation process for Texas Catholic Schools.

C.      ABOUT OUR LADY OF PERPETUAL HELP CATHOLIC SCHOOL

21.     *Our Lady of Perpetual Help Catholic School* is one of a number of schools administered through the Catholic Archdiocese of San Antonio, Texas.  It also accredited by the TEPSAC.  The OLPH Catholic School has developed a *Mission Statement* and *Philosophy* both advertised on its website and published in its S*tudent/Parent Handbook*.  In short, it notes that the school's *Mission* is to fulfill the educational ministry of the Catholic Church in the local community. The goal is to provide quality education and Christian formation of the whole person ... An integral part of its philosophy is "to strive to assist parents ..." by following Jesus' love for the young .... to teach and instill Christ-like attitudes and values ...."

22.     The *Handbook* also notes a duty of the OLPH School to provide for students who have special needs, like J.M. and E.M.  Alternatively, if the OLPH School states that if it cannot provide such services, then the Handbook notes a specific duty to refer the child (and their parents) to other schools or programs that have the ability to serve the child's special needs.  In support of this position the School has specifically adopted standards pursuant to the *Individuals With*

*Disabilities Education Act* ("IDEA"), 20 U.S.C. §1412(a)(8) and the *Family Rights Education Privacy Act* ("FERPA"), 20 U.S.C. §1232g.

23.     It also notes that in general, communication between teachers and parents are critical to the student's success and to "help bring about a loving Christian atmosphere."  In addition, there is the ability for a student, or parent, for that matter, to make a complaint to the appropriate person about any concern they might have.  It generally is first the classroom teacher and next, a school administrator, often the School Principal.   If the School Principal is the object of a complaint (as it is in this case) it should be referred to the School Pastor or Superintendent of Catholic Schools.[3]

24.     That being said there are appropriate behavioral and conduct standards that students must follow that could lead all the way from a simple intervention to probation to dismissal from the school. Importantly, the OLPH School follows a *Hierarchy of Consequences for Inappropriate Behaviors* when administering punishments.  Examples of behaviors that permit the use of the *Hierarchy* is an assault of a student or teacher; selling, possessing or being under the influence of illegal substances; possession of a firearm or weapon; certain felonies or vandalism.

25.     Notwithstanding the above, a student can even be dismissed from the school if the communication between a parent and school official is perceived as abusive or even merely discourteous.  There is no special consideration for a student who has a disability. Moreover, a student dismissed from the school (like J.M. and E.M.) apparently receives no such benefit

---

[3].  To the knowledge of the Mehlberger's neither the OLPH or Wilberg ever made this necessary referral.

from the *Hierarchy of Consequences* policy as a student who breaks a law under the State Penal Code.

C.     ABOUT THE MEHLBERGER FAMILY

26.     Mark and Lisa Mehlberger are both life-long and devoted Catholics.

27.     E.M. was born on March 11, 2003.  J.M. was born on July 9, 2004 almost seven weeks early. She experiences a number of disabling conditions including some developmental delays and problems in integration of sensory stimuli.   Over the course of time she has received occupational therapy and seen numerous doctors and specialists. When mother first noticed signs of developmental delays in J.M, she was very diligent in finding the right doctors and clinicians to diagnose and treat J.M.   This early diagnoses and intervention helped J.M compensate for what was lacking or difficult.   With this support J.M was always able to function normally and was able to be mainstreamed school with non-disabled children.

28.     Based upon their religious values it was important for them to find a school commensurate with their belief system and their children's special needs.   Upon moving to Texas in 2008, the Mehlberger's found a small Catholic School named Rolling Hills Academy ("RHA") which they felt was a very good fit for their children and family. RHA was not run by the Archdioceses of San Antonio.

29.     For 5 years, the Mehlberger's were happy with how the little school met and accommodated their children's needs, and how Catholicism was taught. When RHA and its land were acquired by the Archdiocese of San Antonio, the founder of that school was fired. The Mehlberger's were extremely saddened and shocked by the news and decided to find another Catholic school that could meet their children's needs.

30.     In preparation for the Fall 2013/Spring 2014 School Year, the Mehlberger's completed the necessary contract with the OLPH and received the School Handbook and Code of Conduct.

31.     On August 21, 2013, just three days into attending their new school, OLPH, Lisa, E.M. and J.M. were in a car accident. Lisa had suffered a seizure while driving.   While thankfully there were no major physical injuries, E.M suffered a broken right wrist and a fractured left thumb, along with permanent scars from facial, arm, and leg lacerations. J.M. did experience some traumatic brain injury. J.M. also suffered a slight fracture around her left eye, along with permanent scars from facial and leg lacerations. E.M. and J.M's immediate emotional responses were very different.

32.     E.M. has always been an innately spiritual child, and subsequently experienced immediate feelings of elation and joy regarding God and His knowledge and protection of the accident. J.M completely shut down emotionally. J.M was silent when not crying, was frightened, and refused to speak. Both children were suffering from acute stress disorder. J.M's condition worsened and developed into *Post Traumatic Stress Disorder* ("PTSD"). E.M.'s separation anxieties became more pronounced. The children were out of school for over a week or more. Mother wanted to keep them out longer but it was suggested by 2 different doctors that getting back into a normal routine would help the children.  Upon re-entry, mother's main concerns were the physical and emotional health of the children.

33.     Later in the fall, Lisa spoke with then Principal Jackie Palermo, regarding Jillian's increasing needs for special education services with related accommodations and modifications.  Mrs. Palermo directed Lisa to the Judson Independent School District for special education testing for J.M.    J.M. was noted to have some developmental delays including congenital

encephalopothy[4], an auditory processing disorder[5], a development coordination disorder[6], attention deficit hyperactivity disorder[7], a cortical visual impairment[8], a vestibular disorder[9] and hypotonia.[10]   The evaluation was soon started by Tina Hickman, EdD with the Judson ISD.

34.     On February 3, 2014 mother sent an email Andrea Gonzalez, Director of Counseling and Student Services at the San Antonio Diocese.  In that email she notes that her children had

---

[4].   It is a disorder or disease of the brain. In modern usage, encephalopathy does not refer to a single disease, but rather to a syndrome of global brain dysfunction; this syndrome can have many different organic and inorganic causes.  Depending on the type and severity of encephalopathy, common neurological symptoms are loss of cognitive function, subtle personality changes, inability to concentrate, lethargy, and depressed consciousness. https://en.wikipedia.org/wiki/Encephalopathy .

[5].   Auditory processing disorder is an umbrella term for a variety of disorders that affect the way the brain processes auditory information.   Individuals with APD usually have normal structure and function of the outer, middle and inner ear (peripheral hearing). However, they cannot process the information they hear in the same way as others do, which leads to difficulties in recognizing and interpreting sounds, especially the sounds composing speech. It is thought that these difficulties arise from dysfunction in the central nervous system. https://en.wikipedia.org/wiki/Auditory_processing_disorder.

[6].   This is a chronic neurological disorder beginning in childhood that can affect planning of movements and co-ordination as a result of brain messages not being accurately transmitted to the body. https://en.wikipedia.org/wiki/Developmental_coordination_disorder .

[7].   Known as ADHD it is a neurodevelopmental psychiatric disorder in which there are significant problems with executive functions (e.g., attentional control and inhibitory control) that cause attention deficits, hyperactivity, or impulsiveness which is not appropriate for a person's age. https://en.wikipedia.org/wiki/Attention_deficit_hyperactivity_disorder

[8].   Cortical Visual Impairment is a form of visual impairment that is caused by a brain problem rather than an eye problem.  The latter is sometimes termed "ocular visual impairment" when discussed in contrast to cortical visual impairment. CVI is also sometimes known as cortical blindness, although most people with CVI are not totally blind. https://en.wikipedia.org/wiki/Cortical_visual_impairment

[9].   This disorder effects the sensory system that provides the leading contribution about the sense of balance and spatial orientation for the purpose of coordinating movement with balance. https://en.wikipedia.org/wiki/Vestibular_system .

[10].   Also known as *floppy baby syndrome*, is a state of low muscle tone often involving reduced muscle strength. Hypotonia is not a specific medical disorder, but a potential manifestation of many different diseases and disorders that affect motor nerve control by the brain or muscle strength. The principal treatment for most hypotonia of idiopathic or neurologic cause is physical therapy or occupational therapy for remediation. https://en.wikipedia.org/wiki/Hypotonia .

previously attended Rolling Hills (Academy) Catholic School for five years before switching to the OLPH School.  Further, that she was unhappy with the lack of resources available for her nine (9) year old daughter with learning difficulties and a general concern that this failure would tend to cause other Catholic parents to forego a Catholic School education, for the public school environment.

35.   Ms. Gonzalez responded on the 10th noting that it was the goal of the Diocese to make necessary accommodations and modifications for any child with special needs. Mrs. Mehlberger requested a meeting .  Gonzalez did not respond so on the 19th mother sent her another email and this time she did respond.  A meeting was set up at the San Antonio Diocese for March 27th to discuss concerns about each child's special needs.

36.   By March 6, 2014 the evaluation by Judson ISD was completed.   Hickman determined that J.M. met criteria as a student with a disability pursuant to IDEA under the *Other Health Impaired* eligibility criteria, 20 U.S.C. §1401(3), (30); 34 C.F.R. §300.8(9), with a primary diagnosis of *Attention Deficit Hyperactivity Disorder.*  The evaluator specifically noted that her disabilities overall, which included medical consideration, effected her alertness in the classroom.  More importantly, there were numerous recommendations directing her school, the OLPH to develop an *Individualized Educational Plan* ("IEP", 20 U.S.C. §1401(14); 34 C.F.R. §300.22, for her.

37.   On the 27th Mark and Lisa met with Judson ISD staff, Tina Hickman, and J.M.'a teachers at OLPH, Mrs. Barbera and Mrs. Mouton to address her findings.  Then Principal, Jackie Palermo also attended to discuss the results of the testing.

38.    The group agreed that an *Individualized Educational Plan* ("IEP") be developed for J.M., that writing activities be limited, that she be given frequent breaks during the day, be provided an identified quiet place as a *safe harbour*, limit audio and visual sensory overload and that the school communicate frequently with family.

39.    Also, the report noted her problem in handwriting and that she should have use of a computer in the classroom. It was also recommended that repetition helps her and that writing instruction on the blackboard so that all other students could see it, would lessen any stigma, that she was being treated differently.

40.    Last, it was suggested she be assessed by a clinical psychologist to address issues of depression, though J.M and E.M were already under the care of a psychologist since the car accident.

41.    For the rest of that Spring period, the OLPH substantially provided J.M. the services noted in the IEP services, accommodations and modifications to J.M.

42.    In preparation for the Fall 2014/Spring 2015 School Year, the Mehlberger's completed the necessary contract with the OLPH and received the School Handbook and Code of Conduct. Little did they know the promises made in the spring semester would be broken in the fall semester.

43.    On June 11th and in preparation for the fall semester mother met with Father Ritter at the school to introduce herself and again discuss her children's needs, especially those for J.M. At that time she was introduced to the new Principal, Kirsch Wilberg who spoke about her team "putting together a program for children like J.M." Mother was encouraged but since the specifics of the program were not addressed mother remained skeptical.   They agreed to meet again and did so on July 10th.

44.   Another meeting was set for the 25th in order to implement an educational accommodation plan for J.M. including availability of on-line books, a planner to better communicate between the classroom teachers and the family, and training for staff.

45.   E.M. also has *Attention Deficit Hyperactivity Disorder* (ADHD) which permitted her to receive what is termed "preferential seating" so that she could sit in the front of the classroom, near the teacher.   She was also supposed to receive a copy of class notes and a second set of books, one for school and one for home, as part of her accommodations (yet E.M never received those).   Vice principle Ernie Gottfried and Dean of Students, Norma Cooper attended the meeting. Principal Wilberg was expected at this meeting but she did not attend.

46.   On June 30th E.M.'s physician wrote a note confirming her Generalized Anxiety Disorder, ADHD with medications prescribed and for some academic accommodations.   She also has symptoms of arthritis and chronic pain.

47.   Just days later and on July 2nd E.M.'s physician specifically recommended Occupational Therapy, provide preferred seating, shortened tasks, visual supports, information broken up into discrete tasks and a quiet area for schoolwork.   All this information was provided again to the school (and like her sister, these crucial services were never given to the child, by the school).

48.   On July 18th J.M.'s physician wrote an *Order* noting her physical exercise should be limited to avoid overheating.

49.   On or about the 28th J.M.'s doctor re-confirmed a diagnosis of PTSD and ADHD and prescribed medications for her

50.   When school started in August almost none of the accommodations were provided to either child.

51.     On August 21st mother sent an email to Ms. Gonzales with the Diocese and the new Principal, Kirsch Wilberg.  One item of concern was that the children's assignments were not being correctly communicated between the school and home as previously discussed, especially for E.M.  Another, was that certain on-line materials that were promised for the children's use were not available, including books.

52.     In regard to J.M. mother reported in the email her concern that staff apparently had not been trained as to her disabilities and IEP.  For instance, she was being admonished for items related to her ADHD, like being slow in responding to her teacher's directions.  Further, that J.M. was in tears when coming home from school and already expressing her desire not to return.  Mother reported J.M.'s PTSD, especially in light of the fact  the next day was the anniversary of the car accident.  Mother suggested a meeting with all the teachers, so as to discuss the various accommodations given to each child.  There was no support provided by the Diocese in regard to the email and underlying situation addressed therein.

53.     Principal Wilberg emailed mother to make sure that J.M was given her medication but otherwise ignored mother's comments and request for another meeting to clarify responsibilities.

54.     J.M. continued to be admonished and even punished for behaviors related to her disabilities.  Specifically, she is written up in class for not paying attention, for not having a folder in social studies and for taking too long in getting her books from her locker to her classes.

55.     The next day, August 22nd, Mother was very upset and called Father Ritter.  Mother had a very direct conversation, complete with observations and opinions, with the Priest regarding Principal Wilberg and her lack of understanding of the situation, her lack of urgency in implementing

accommodations, her lack of how to properly communicate to mother and father, as well as her lack compassion regarding the children and family.

56. Father Ritter contacted Principal Wilberg and Andrea Gonzales in an effort to put together a meeting for that same afternoon at 3:30.

57. All administrative staff was present, as well as Principal Wilberg, Andrea Gonzales and the Mehlberger's. Father Ritter did not attend. This was the last time Father Ritter would get involved with the Mehlberger family.  All further attempts to reach him by Mrs. Mehlberger went unanswered.

58. A few days later E.M. told mother that she was not receiving al her necessary accommodations, so that she missed a number of notes and discussion of overhead slides.

59. On the 25th Mrs. Mehlberger again spoke with Andrea Gonzalez at the San Antonio Diocese. Mehlberger also spoke with Wilberg about these concerns, who said she would take care of E.M.'s accommodations, though she never did.

60. On September 2nd Mother sent an email to Gonzalez at the Archdiocese with a number of concerns.   Specifically that J.M.'s accommodations were not being met, and she was not receiving necessary supervision and teaching.  As such she was receiving F's in almost every assignment. This was a detailed and long letter stating that roughly eight (8) different accommodations were still not being implemented and requested a meeting with the next day or two. Mrs. Mehlberger, having been working with Ms. Gonzalez for many months, considered her to be in a position to help address the situation.

61. About a week later on September 9th, Ms. Gonzalez finally responded to assure Mrs. Mehlberger that OLPH does have a new qualified staff, and asked her to work "in-trust" with OLPH staff.

62.     Mother reported she had observed three (3) children, also requiring accommodations, being taught by an Aide in the cafeteria on several mornings. Mother requested that J.M receive the same assistance.   The request was refused.

63.     Mother also requested that J.M. be given notes in all classes and needs assistance in having her planner checked every day. Further, because of having Asthma and due to the heat, that in addition, her physical education class be reduced as an accommodation, pursuant to doctor's orders. This physical condition issue was also left unresolved.

64.     Early on September 9th Mrs. Mehlberger sent an email to the school stating she would be retaining an *Educational Advocate* to assist her in advocating on behalf of the children.

65.     On the Sept. 10th Mr. and Mrs. Mehlberger had an appointment to meet with Principal Wilberg. When mother stepped into the office to sit down, Wilberg told them not to so, as the meeting would not be very long. Wilberg then stated: "This is no longer a partnership, you don't trust us and you need to reflect on that."   Mrs. Mehlberger was caught off guard as she thought this was supposed to be a true meeting. She then asked "are you asking us to leave the school?" Principal Wilberg didn't directly answer mother's question, but responds by saying "I don't know why you are still here because you don't trust us." Mrs. Mehlberger responds "No, we are not leaving, and I suppose this is not a partnership because I do not trust you. I've not been given good reason to trust you. But I have been holding your feet to the fire regarding the commitment you made to help my children. I suggest you reflect on that." Principal Wilberg responds, "I have" and walked away making it clear that no further communications would be accepted by her.

66.   Mrs. Mehlberger went directly to the parish office to speak with Father Ritter. She was told he is not in the office.  She made several attempts to contact Father Ritter but they too go unanswered.

67.   On the 11th mother sends an email to Ms. Gonzalez noting J.M.'s fear to return to class.  She also tells Andrea of the events that took place on September 10th with Wilburg.

68.   On the 15th Mrs. Mehlberger, like many parents, came to class to observe J.M.  After the class mother commented that she had noticed Mrs. Gill, asking J.M. for a paper, then scolding her when she did not, when all along it was already in Gill's possession.  Mother thought little of the interaction.

69.   After lunch, mother and J.M are sitting at the tables outside the classrooms drawing together. Mrs. Wilberg walks up to them and threatens to have Mrs. Mehlberger removed from campus.

70.   Not surprisingly J.M. became nervous and anxious and had to visit the school nurse.

71.   After school mother is waiting outside, meets  with J.M. and Mrs. Gill hands mother the paper that J.M was supposed to have had.

72.   On the next day J.M. stays home from school and instead visits her psychologist, for an emergency session.

73.   On the 16th mother sends an email to Marti West, Superintendent at the Department of Catholic Schools Archdiocese of San Antonio seeking help.  She also sends an email to the Vice-Principal Gottfried about her problems with Wilberg, the concerns about schoolwork and accommodation issues.  West doesn't respond.

74.   J.M. returns to school on the 17th but the nurse calls reporting that J.M. now seems depressed. J.M. returns to her doctor and reports she is now scared to go to school.  The doctor refers her for home-school services.

75.   Also on the 17th mother asks E.M.'s science teacher to assure E.M. receives preferential seating, as previously requested, and part of the child's promised accommodation plan.

76.   On the 18th mother picks up E.M. from school at the gym where she had cheer practice. E.M tells her mother that she was told by her home room teacher, Mr. Terry Taubert, (who was also the Principal of OLPH many years ago) that she didn't need to have her planner signed, she didn't need to do any homework and to leave her books at school.  When they reach home, mother then receives another phone call from her husband who tells her he received an email stating that both their daughters had just been kicked out of school.

77.   Mother never returns to the school but on the 19th learns from a friend that Wilberg had arranged for two police cars to be at the school waiting to meet her.  This spectacle occurs in front of all the school children, their parents dropping their children off at school that day, the rest of the educational community including administrators, teachers, non-professional staff, as well as the police.

78.   The family is led to understand that the OLPH expelled the children from school because they didn't have the resources to address the accommodations and modifications required by each child.

79.   The family is not given any referral services for the children, as required by the OLPH's own handbook and standards.

80.   No one from the School intervenes on behalf of the children.

81.   No one from the Diocese intervenes on behalf of the children.

## VI.  CLAIMS UNDER THE AMERICANS WITH DISABILITIES ACT

82.   Plaintiffs incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

83.   In addition and in the alternative to the above, the facts as previously described demonstrate violations of the Americans with Disabilities Act, 42 U.S.C. §12131, et seq ("ADA").

84.   The Catholic Diocese of San Antonio, Texas has an agreement with the United States Department of Agriculture ("DOA") to provide free and low-cost breakfasts, to children at their member schools. In such agreements, there is a requirement that the Diocese assures that it will follow a number of federal standards, including and especially the duty not to discriminate based upon disability, pursuant to the ADA.

85.   Pursuant to that agreement, the member schools with the Diocese, including the *Our Lady Of Perpetual Help Catholic School,* operated by the Diocese is also a, "public entity" as defined in 42 U.S.C. §12131(1).

86.   In a related vein, both the Diocese and the OLPH sponsor activities to members of the public, that are no related to religious issues, thus satisfying the definition of a "public entity" as defined by the ADA.

87.   Further, the Diocese and Catholic School both have facilities and operations that constitute a program and services for ADA purposes.

88.   Moreover its *Student / Parent Handbook* at p. 8 [Students With Special Needs], affirms such a duty to address the needs of students with disabilities.

89.     Plaintiffs J.M. and E.M. are both a "qualified individual with a disability" as defined in 42 U.S.C. §12131(2).

90.     The Diocese and by extension OLPH Catholic School have failed and refused to reasonably accommodate and modify its services for J.M. and E.M., in violation of Title II of the ADA pursuant to their agreement with the U.S. Department of Agriculture.

91.     The Diocese and by extension OLPH Defendant Catholic School have failed and refused to reasonably accommodate and modify its services for J.M. and E.M., when retaliating against them for the advocacy provided on their behalf by her mother, Lisa Mehlberger, in violation of Title II of the ADA, 42 U.S.C. §12203; 28 C.F.R. §36.206.

92.     Such failures caused injuries to Plaintiffs J.M and E.M. who were both victims of retaliation when asked to leave the Catholic School because of the advocacy of their mother, 42 U.S.C. §12203, 28 C.F.R. §36.206.

93.     In addition, Lisa Mehlberger has a separate cause of action against these Defendants based upon retaliation, also pursuant to the ADA, 42 U.S.C. §12203, 28 C.F.R. §36.206.

### VII.   CLAIMS UNDER SECTION 504 OF THE REHABILITATION ACT OF 1973

94.     Plaintiffs incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

95.     In addition and in the alternative to the above, the facts as previously described demonstrate violations of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, ("Section 504").

96.     The Catholic Diocese of San Antonio, Texas has an agreement with the United States Department of Agriculture ("DOA") to provide free and low-cost breakfasts, to children at their

member Catholic School's. In such agreements, there is a requirement that the Diocese assures that it's member school's follow a number of federal standards, including and especially the duty not to discriminate based upon disability, pursuant to Section 504; 34 C.F.R. §104.4; §104.39.

97.    Further, Plaintiff J.M. and E.M. are both a "qualified individual with a disability" as defined by Section 504; 34 C.F.R. §104.3.

98.    The Diocese and by extension the Defendant Catholic School have failed and refused to reasonably accommodate and modify its services for J.M. and E.M., in violation of Section 504; 34 C.F.R. §104.33; §104.34.

99.    The Diocese and Defendant Catholic School have failed and refused to reasonably accommodate and modify its services for J.M. and E.M., when retaliating against them for the advocacy provided on their behalf by her mother, Lisa Mehlberger, in violation of Section 504; 34 C.F.R §104.61; §100.7.

100.   Such failures caused injuries to Plaintiffs J.M and E.M. who were both victims of retaliation when asked to leave the Catholic School because of the advocacy of their mother, 34 C.F.R §104.61; §100.7.

101.   In addition, Lisa Mehlberger has a separate cause of action against Defendants based upon retaliation, pursuant to the Section 504, 34 C.F.R §104.61; §100.7.

## VIII.  **BREACH OF CONTRACT**

102.   Plaintiffs incorporate by reference the allegations set forth above as if the same were fully set forth herein.

103.   The Diocese by and through one of their member schools, the Our Lady of Perpetual Hope Catholic School, has breached their contract with the family, by not providing services commensurate with the policies noted on the schools website and handbook.

104.   As such, Plaintiffs have experienced damages, all as more fully set forth herein.

## IX.  NEGLIGENT MISREPRESENTATION

105.   The Plaintiffs incorporate by reference the factual allegations contained in the preceding paragraphs.

106.   Plaintiffs would show that Defendant Our Lady of Perpetual Hope Catholic School made false representations in the course of a transaction in which this Defendant had a pecuniary interest, and that the representations made by this Defendant to guide the Plaintiffs in the conduct of Plaintiffs' business.

107.   This Defendant failed to exercise reasonable care or competence in obtaining or communicating such information represented.

108.   Plaintiffs justifiably relied on the misrepresentations of this Defendant, resulting in pecuniary losses.

109.   Plaintiffs therefore assert a cause of action for negligent misrepresentation against this Defendant, as provided by Federal Land Bank Association of Tyler v. Sloane, 825 S.W.2d 439 (Tex. 1991).

## X.  DECEPTIVE TRADE PRACTICES

110.   Plaintiffs incorporate by reference all the above related paragraphs, as if fully set forth.

111.    In addition and in the alternative to the above, Plaintiffs would show that Our Lady of Perpetual Hope Catholic School, engaged in certain false, misleading and deceptive acts, practices and/or omissions actionable under the Texas Deceptive Trade Practices-Consumer Protection Act (Texas Business and Commerce Code, Chapter 17.41, *et seq*.), as alleged herein.

112.    Defendant engaged in as "unconscionable action or course of action" to the detriment of Plaintiffs, as that term is defined by Section 17.45(5) of the Texas Business and Commerce Code.

113.    Defendant also violated Section 17.46(b)(5) of the Texas Business and Commerce Code, in that Defendant represented that it provided a Catholic School education, that it did not have.

114.    Plaintiffs would show that the acts, practices and/or omissions complained of were the proximate cause or in the alternative the producing cause of damages experienced by Plaintiffs, as more fully described herein.

115.    Plaintiffs would further show the acts, practices and/or omissions complained of under Section 17.46(b) of the Texas Business and Commerce Code were relied upon to their detriment.

116.    Plaintiffs will seek attorney fees, taxable and non-taxable costs as well as expert fees, as an appropriate remedy in this cause.

## XI.  LIBEL AND SLANDER

117.    Plaintiffs incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

118.    The acts of Defendant Wilberg, when making statements that Mrs. Mehlberger had committed

a crime or was about to commit a crime, or was otherwise dangerous to herself or others, was

both defamatory and libelous, and of both a common law and statutory nature.

119.    Such acts caused damages to Plaintiff Mehlberger.

120.    Plaintiff Lisa Mehlberger has provided notice to Defendant Wilberg of this claim, pursuant to

Chapter 73 of the Texas Civil Practices & Remedies Code.

## XII.  PROXIMATE CAUSE

121.    Plaintiffs incorporate by reference all the above related paragraphs with the same force and

effect as if herein set forth.

122.    Each and every, all and singular of the foregoing acts and omissions, on the part of the

Defendants, jointly and severally, taken separately and/or collectively, constitute a direct and

proximate cause of the injuries and damages of Plaintiffs, as set forth herein.

## XIII.  RESPONDEAT SUPERIOR

123.    Plaintiffs incorporate by reference all the above related paragraphs with the same force and

effect as if herein set forth.

124.    The Defendant Archdiocese of San Antonio, Texas is responsible for and as such ratified the

acts, omissions and customs of all administrators, personnel, staff, contractors and agents, in

regard to services provided to and on behalf of Plaintiffs, pursuant to theory of Respondeat

Superior.

125.    The Defendant Our Lady Of Perpetual Help Catholic School is responsible for and as such

ratified the acts, omissions and customs of all administrators, personnel, staff, contractors and

agents, in regard to services provided to and on behalf of Plaintiffs, pursuant to theory of Respondeat Superior.

## XIV. <u>AGENCY</u>

126.    Plaintiffs incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

127.    At and during the time of the acts and/or omissions complained of herein, any acts and/or omissions committed by an agent, representative or employee of the Archdiocese occurred within the scope of the actual or apparent authority of such person on behalf of said Defendant.

128.    Said Defendant is therefore liable to Plaintiffs for the acts and/or omissions of any such agent, representative or employee complained of herein by virtue of such agency relationship

129.    At and during the time of the acts and/or omissions complained of herein, any acts and/or omissions committed by an agent, representative or employee of the OLPH School occurred within the scope of the actual or apparent authority of such person on behalf of said Defendant.

130.    Said Defendants are therefore jointly and severally liable to Plaintiffs for the acts and/or omissions of any such agent, representative or employee complained of herein by virtue of such agency relationship

## XV. <u>DAMAGES</u>

131.    Plaintiffs incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

132.    As a direct and proximate result of the occurrence made the basis of this lawsuit, and Defendants' acts as described herein, jointly and severally, Plaintiffs were caused to suffer greatly, and to endure anxiety, pain, and illness resulting in damages as a parent.

133.    As a direct and proximate result of the occurrence made the basis of this lawsuit, Plaintiffs have incurred the following damages:

    a.      Reasonable mental health care and expenses in the past;

    b.      Reasonable and necessary mental health care and expenses which will, in all reasonable probability, be incurred in the future;

    c.      Mental anguish;

    d.      Mental anguish in the future;

    e.      various out-of-pocket expenses related to curing the acts and omissions of the Defendants; and

    f.      various out-of-pocket expenses including but limited to reasonable attorney fees and costs, incurred "but for" the acts and omissions of the Defendants.

134.    In addition and in the alternative to the above, Plaintiff Lisa Mehlberger has also pled a separate cause of action against the School's Principal, Kirsch Wilberg.  As such, she pleads economic damages as compensation for such acts and omissions by Wilberg.

## XVI.  <u>PUNITIVE DAMAGES</u>

135.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

Original Complaint                                                                                28

136.  The acts and omissions of Defendant Wilberg, over the relevant time period, not only shocks the conscience but satisfies criteria for punitive damages.

## XVII.  ATTORNEY FEES

137.  Request is made for all costs and reasonable and necessary attorney's fees incurred by or on behalf of Plaintiffs herein against the Defendant Archdiocese of San Antonio, Texas, *Our Lady of Perpetual Hope Catholic School,* both pursuant to the Americans With Disabilities Act, Section 504 of the Rehabilitation Act of 1973 and state law claims as provided by: (a) Section 17.50(d) of the Texas Business and Commerce Code; (b) Section 27.01(e) of the Texas Business and Commerce Code; Chapter 38 of the Texas Civil Practice and Remedies Code and the (d) common law both jointly and severally.

## XVIII.  PLAINTIFFS REQUEST TRIAL BY JURY

## XIX.  CONCLUSION AND PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs prays for judgment against the Defendants in the manner and particulars noted above, jointly and severally and in an amount sufficient to fully compensate them for the elements of damages enumerated above, recovery of attorney's fees and costs for the preparation and trial of this cause of action, and for its appeal if required, together with pre- and post-judgment interest, and court costs expended herein, and for such other relief as this Court in equity, deems just and proper and for such other relief as the Court may deem just and proper in law or in equity, or both.

Respectfully submitted,

Cirkiel & Associates, P.C.

<u>/s/ Martin J. Cirkiel</u>
State Bar No. 00783829
[marty@cirkielaw.com](mailto:marty@cirkielaw.com) [Email]
Daniel Garza
State Bar No.: 24081363
[dangarza@cirkielaw.com](mailto:dangarza@cirkielaw.com) [Email]

1901 E. Palm Valley Boulevard
Round Rock, Texas  78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]
ATTORNEYS FOR PLAINTIFFS